IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC ROBINSON, | ) | CASE NO. 1:19-cv-01209 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Eric Robinson (Plaintiff" or "Robinson") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Robinson filed applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI") in 2013 and 2016.  The 2016 applications are at issue in this appeal.  To

provide context, the procedural history relative to the 2013 applications is also summarized

below.

1

<u>2013 applications for disability benefits</u>

In 2013, Robinson filed applications for DIB and SSI, alleging disability as of August 1, 2011.  Tr. 93.  Following a hearing on those applications, on April 29, 2016, an administrative law judge ("ALJ") issued an unfavorable decision, finding Robinson not disabled from August 1, 2011, through the date of the decision. Tr. 90-111.  On October 26, 2016, the Appeals Council denied review.  Tr. 112-118.  Robinson did not appeal the decision to the district court.  Tr. 34.

<u>2016 applications for disability benefits</u>

In December 2016, Robinson protectively filed applications for DIB and SSI.  Tr. 34, 119, 135.  Robinson originally alleged a disability onset date of March 1, 2012, but later amended his alleged onset date to December 8, 2016.[1]  Tr. 34, 242.  He alleged disability due to PTSD, numbness/tingling in lower back, knee pain and hip pain.  Tr. 170, 179, 268.  After initial denial by the state agency (Tr. 170-176) and denial upon reconsideration (Tr. 179-190), Robinson requested a hearing (Tr. 191-192).  On June 29, 2018, a hearing was held before an ALJ.  Tr. 62-89.

On August 14, 2018, the ALJ issued a decision unfavorable to Robinson (Tr. 31-61), finding that he had not been under a disability within the meaning of the Social Security Act from December 8, 2016, through the date of the decision (Tr. 35, 56).  Robinson requested review of the ALJ's decision by the Appeals Council. Tr. 219-221.  On May 15, 2019, the Appeals Council denied Robinson's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7.

---

[1] In light of the amended alleged onset date, Robinson's DIB claim was dismissed.  Tr. 34, 66.

## II. Evidence

**A.    Personal, educational, and vocational evidence**

Robinson was born in 1957.  Tr. 55, 68.  He has at least a high school education.  Tr. 55, 69.  Robinson's past work includes work as a nurse assistant.  Tr. 54, 71, 69-71.

**B.    Medical evidence**

### 1.   Treatment history

*Physical impairments*

On July 29, 2016, Robinson was seen at Northeast Ohio Neighborhood Health Services, Inc. ("NEON") for neck and back pain.[2]  Tr. 340-343.  Treatment notes reflect that Robinson's neck pain started five years prior; with the severity of the problem described as moderate and not having changed.  Tr. 340.  Robinson's back pain also started five years earlier.  Tr. 340.  Robinson's back pain was located in his lower back with no radiation of pain.  Tr. 340.  Robinson's pain was rated a 0/10.  Tr. 341.  On physical examination, Robinson's gait was normal and his cervical, thoracic and lumbar spine were normal.  Tr. 342.

A few days later, on August 1, 2016, Robinson was seen at NEON again for his back pain.  Tr. 344-346.  Robinson's pain was rated a 10/10.  Tr. 345.  Physical examination findings were normal.  Tr. 345.  X-rays of the neck and lower spine were ordered.  Tr. 345.  The cervical spine findings were as follows: "Cervical vertebral bodies are preserved in height and are normally aligned.  Disc space heights are fairly well maintained.  Prominent anterior osteophyte

---

[2] Plaintiff indicates that he saw Dr. Jerome Williams at this visit.  Doc. 14, p. 4.  However, the treatment record does not appear to list Dr. Williams.  Rather, the notes reflect that Suzanne White, M.D., was the provider at the July 29, 2016, visit.  Tr. 342-343.

formation involves C4-5 through C6-7 characteristic of DISH.[3]  No fracture or focal soft tissue

swelling is seen." Tr. 335.  The impression was "[m]ild arthritis, DISH, no fracture." Tr. 335.

The lumbar spine findings were as follows: "Vertebral bodies are normally aligned.  No

significant scoliosis is present.  Vertebral body heights are normal.  Moderate to severe disc

space reduction involves L5-S1.  Sclerosis involves posterior elements of the mid and distal

lumbar spine; however, no spondylolysis or spondylolisthesis is seen.  No acute fracture is

identified.  Soft tissues are relatively unremarkable." Tr. 336.  The impression was "lumbosacral

arthritis, no fracture or significant spondylolisthesis." Tr. 336.

On September 12, 2016, Robinson saw Dr. Jerome Williams, M.D., at NEON for his

neck and back pain. Tr. 350-351.  Robinson reported decreased mobility and musculoskeletal

tenderness. Tr. 350.  He rated his pain as a 10/10. Tr. 350.  Physical examination findings were

normal. Tr. 351.  Robinson's medications included cyclobenzaprine, tramadol, Extra Strength

Tylenol, and Prozac. Tr. 351-352.

On October 11, 2016, Robinson saw Dr. Dwight Carson, M.D., at NEON for his back

pain. Tr. 359-364.  Robinson reported that his symptoms were moderate and occurred daily. Tr.

359.  He described his symptoms as sometimes being intense. Tr. 359.  Prolonged sitting and

standing were aggravating factors. Tr. 359.  Medications helped relieve his symptoms but not

completely. Tr. 359.  He had returned to the clinic to get refills on his Extra Strength Tylenol

and Ultram (tramadol).[4] Tr. 359.  Robinson rated his pain as 8/10. Tr. 362.  Robinson's

musculoskeletal examination was "unremarkable. Gait – no assistive device, full weight

bearing[] and "[n]o definite kyphoscoliosis[.]" Tr. 362.  There was no edema observed in the

---

[3] DISH stands for diffuse idiopathic skeletal hyperostosis.  Tr. 635.

[4] Tramadol is the generic name for Ultram.  https://www.webmd.com/drugs/2/drug-11276/ultram-oral/details (last visited 8/3/2020).

extremities.  Tr. 362.  Dr. Carson assessed chronic midline low back pain without sciatica and other chronic pain.  Tr. 363.  Dr. Carson instructed Robinson to follow up with Dr. Williams on an as needed basis.  Tr. 363.

Robinson saw Dr. Carson on November 15, 2016, regarding his neck and back pain.  Tr. 368-370.  Robinson rated his pain as 8/10.  Tr. 369.  Physical examination findings were normal.  Tr. 369.  Robinson's gait was normal; he ambulated "without difficulty and without an aide[.]"  Tr. 369.  Dr. Carson's assessment was chronic midline low back pain without sciatica and chronic neck pain.  Tr. 369.  Dr. Carson recommended that Robinson communicate with his insurance company to find out what pain management centers would accept his insurance so that a referral could be made.  Tr. 369.  Dr. Carson did not refill Robinson's Ultram and Robinson expressed his dissatisfaction with Dr. Carson not doing so.  Tr. 369.

On December 13, 2016, Robinson saw Dr. Carson for back pain and depression.  Tr. 374-378.  Robinson described his back pain as moderate-severe with the location of his pain in his lower back and neck.  Tr. 374.  Robinson's symptoms were aggravated by bending, extension, flexion, lifting, pushing, running and twisting.  Tr. 374.  His symptoms were relieved by use of prescription medication.  Tr. 374.  Robinson indicated he had been going to pain management and it helped.  Tr. 374.  Robinson rated his pain as 7/10.  Tr. 376.  Examination of Robinson's neck was normal; his cervical spine was unremarkable; and his lumbar spine was a little tight.  Tr. 376-377.  Robinson ambulated without much difficulty and his gait was normal.  Tr. 377.  No edema was observed in Robinson's extremities.  Tr. 377.  Dr. Carson continued Robinson on Extra Strength Tylenol and recommended that Robinson continue with pain management for his low back pain without sciatica.  Tr. 377.

On June 13, 2017, Robinson saw Dr. Carson again for back pain with associated muscle spasms and weakness.  Tr. 444-447.  Robinson described the back pain as aching and indicated it was aggravated by bending, lifting, movement and pushing and relieved by prescription medication.  Tr. 444.  Robinson also complained of neck pain, joint pain and joint swelling.  Tr. 445.  Robinson rated his pain level as 9/10.  Tr. 446.  Physical examination findings showed slight tenderness of the cervical spine; tenderness in the right shoulder with a mildly reduced range of motion; left shoulder normal; no edema in the extremities; and normal sensation and reflexes.  Tr. 446.  Dr. Carson assessed chronic neck pain for which Robinson was taking tramadol and he assessed chronic right shoulder pain and ordered a shoulder x-ray.  Tr. 447.

Robinson saw Dr. Carson again July 11, 2017, regarding his chronic pain.  Tr. 449-452. Robinson reported moderate symptoms that occurred daily, noting that he had good days and bad days.  Tr. 449.  Robinson indicated he needed prescription refills.  Tr. 449.  Robinson rated his pain level as 9/10.  Tr. 450.  On physical examination, Dr. Carson noted tenderness in Robinson's thoracic spine, lumbar spine, right shoulder, and bilateral knees.  Tr. 450.  There was no edema in the extremities.  Tr. 450.  Dr. Carson assessed chronic pain syndrome.  Tr. 451.  He ordered naproxen and instructed Robinson to return in a month.  Tr. 451.

Robinson returned to see Dr. Carson on August 15, 2017, regarding his pain.  Tr. 453-456.  Robinson rated his pain level as 9/10.  Tr. 455.  On physical examination, Dr. Carson observed tenderness in the thoracic spine and mild pain with motion.  Tr. 455.  There was tenderness in the lumbar spine with mildly reduced range of motion.  Tr. 455.  There was no evidence of muscle wasting.  Tr. 455.  Robinson's gait was normal.  Tr. 455.  He had normal sensation and reflexes.  Tr. 455.  Dr. Carson assessed chronic neck and back pain and encouraged Robinson to check with his insurance company to find a pain management center

covered under his plan so that they could supply him with a chronic tramadol prescription.  Tr. 456.

On September 29, 2017, Robinson saw Dr. Salim Hayek, M.D., of University Hospital for his complaints of neck and back pain.  Tr. 633-636.  Dr. Hayek noted that Robinson had seen a different doctor in 2016 (Dr. Hopcian) and, in November 2016, it was recommended that Robinson proceed with cervical and lumbar epidural steroid injections, physical therapy and possibly start gabapentin.  Tr. 633.  Robinson did not proceed with the injections because he had a phobia of needles.  Tr. 633.  He participated in physical therapy for two months at the end of 2016 but had not been attending since that time because he was taking care of his ill mother.  Tr. 633.  On physical examination, Robinson had normal range of motion in his muscles/joints/bones; his grossly normal gait; he was nontender to palpation along the facet joints, paraspinal muscles and SI joints; there was 5/5 motor strength in the lower and upper extremities bilaterally; there was pinpoint tenderness at the paraspinous muscles at the C5, T6, and L5 levels; there was positive Spurling[5] bilaterally; he had full range of motion in his upper and lower extremities; there was negative Hoffman's bilaterally; 5/5 strength in the biceps and triceps; and normal sensation.  Tr. 634-635.  Dr. Hayek diagnosed DISH and thoracolumbar back pain.  Tr. 635.  Dr. Hayek started Robinson on amitriptyline; renewed the tramadol prescription; discontinued baclofen, Flexeril, and Naprosyn; and provided a physical therapy referral.  Tr. 635. Dr. Hayek discussed the importance of core strength exercises and he advised Robinson to perform low impact, high intensity exercises six days a week for an hour.  Tr. 635.

---

[5] A Spurling "test is most commonly defined in the current literature as the passive cervical extension with rotation to the affected side and axial compression. The test is considered positive when radicular pain is reproduced (pain radiates to the shoulder or upper extremity ipsilateral to the direction of head rotation)." Steven J. Jones; John-Mark M. Miller, *Spurling Test*, National Center for Biotechnology Information, U.S. National Library of Medicine (April 30, 2019), https://www.ncbi.nlm.nih.gov/books/NBK493152/ (last visited 8/3/2020).

On October 18, 2017, upon Dr. Hayek's referral, Robinson had a physical therapy evaluation.  Tr. 501-502, 601-607.  From October 18, 2017, through February 5, 2018, Robinson attended 11 physical therapy sessions.  Tr. 585.  On April 2, 2018, Robinson was discharged from physical therapy for failure to schedule and/or keep follow-up appointments.  Tr. 585.  The discharge summary states the following regarding Robinson's status at discharge:

> At last session, pain seemed to be less intense. Occasionally would have elevated pain however didn't occur as frequently or last as long as before. Continued to have some core and postural weakness. Encouraged to stay consistent with home exercise program and update me on his status in 2 to 3 weeks however failed to do so.

Tr. 585.

On January 9, 2018, Robinson saw a nurse practitioner at NEON because of an injury to his right foot.  Tr. 467-471.  Treatment notes indicate that Robinson relayed he had "stepped on a nail that was on a board yesterday while fixing a leaking tub in a[] rented apartment."  Tr. 467.

Following the hearing before the ALJ, Robinson submitted additional records from Dr. Hayek to the Appeals Council.  Tr. 2, 8-12, 13-25; Doc. 14, pp. 10-11.  The records – dated May 17, 2018, to November 28, 2018 (Tr. 2) – were not submitted to the ALJ.

### *Mental health impairments*

Starting in 2015, Robinson received treatment from NEON for his mental health related problems.  Tr. 408.  Prior to that he received mental health treatment in 2010 through 2012 at Metro Health.  Tr. 408.  A July 12, 2016, NEON psychotherapy treatment note reflects diagnoses of PTSD, chronic and adjustment disorder with mixed disturbance of emotions and conduct.  Tr. 337-339.

Upon a referral from a psychotherapist at NEON, Robinson presented for an assessment at Murtis Taylor Human Services ("Murtis Taylor") on July 25, 2016.  Tr. 401-410.  As a result

of past trauma, Robinson reported that he had intrusive nightmares about a gun being pointed at him and a Halloween mask. Tr. 401. The dreams caused sleep disturbances. Tr. 401. Most of the time, Robinson felt anxious and frustrated. Tr. 401. He was irritable and exhausted on a daily basis. Tr. 401. He lacked interest in activities and socializing. Tr. 401. Robinson also relayed that he had persistent back and neck pain and was having a hard time handling his mother's recent cancer diagnosis. Tr. 401. Robinson was exposed to trauma in his neighborhood on an ongoing basis. Tr. 401. Robinson was receiving counseling services from Amber Davis-Dumas, MSSA, LISW, ("Ms. Davis" or "Ms. Dumas") at NEON for his depression and PTSD. Tr. 403, 347-349. Robinson indicated he isolated to avoid interacting with others. Tr. 409. The LISW conducting the assessment diagnosed PTSD and major depressive disorder, recurrent. Tr. 410. A further psychiatric evaluation was recommended. Tr. 409.

During a September 13, 2016, counseling session with Ms. Davis, Robinson reported increased irritability and psychomotor agitation secondary to running out of his antidepressant medication. Tr. 353. Also, Robinson had decreased stress tolerance. Tr. 353. With the Halloween season approaching, Robinson relayed that his phobic thoughts were increasing. Tr. 353.

On September 16, 2016, Robinson presented at Murtis Taylor for his psychiatric evaluation that was conducted by psychiatrist Edward Dutton. Tr. 411-413. Dr. Dutton observed Robinson to have an appropriate affect; his mood was euthymic; his thought processes/content was coherent; he had no suicidal or homicidal ideation or intent; he had no hallucinations or delusions; his speech was clear and distinct; his intelligence was average; his concentration and memory were intact; and his judgment/insight were fair. Tr. 412. Dr. Dutton

diagnosed PTSD and major depressive disorder, recurrent.  Tr.  413.  He recommended that Robinson continue with counseling at NEON and no additional medications were prescribed.  Tr. 413.

On October 11, 2016, Robinson saw Ms. Davis.  Tr. 356-358.  Robinson reported increased anxiety due to his mother's upcoming hip surgery and the upcoming Halloween holiday.  Tr. 356.  Robinson explained that he planned to "sequester himself in his room for the day and watch movies."  Tr. 356.  Robinson reported an increase in visual disturbances and his mood was mixed that day.  Tr. 356.  Ms. Davis observed a depressed, anxious mood; fatigue; and a flat affect.  Tr. 357.

During a November 15, 2016, session with Ms. Davis, Robinson reported decreased stress tolerance and increased irritability – he planned to add exercise to see if it would help his mood.  Tr. 365.  Robinson indicated that the change of seasons and decreased amount of light was not helping with his mood.  Tr. 365.  He had additional stress due to caregiving responsibilities since his mother had her surgery.  Tr. 365.

On December 8, 2016, Robinson saw an advanced nurse practitioner at Murtis Taylor for medication management.  Tr. 441-443.  Robinson was observed to have an anxious affect; rambling speech; a euthymic mood; concrete thought process; auditory hallucinations; no delusions; no suicidal or homicidal ideation; and limited judgment and insight.  Tr.  442. Laboratory work was ordered prior to starting medications.  Tr. 442.

When Robinson saw Ms. Davis on December 13, 2016, he reported feeling more "down" over the prior two weeks which coincided with the weather being very cold.  Tr. 371.  Robinson relayed that he was more reclusive and isolating more.  Tr. 371.  He was seeking medication management services through Murtis Taylor and trying everything to help improve his mood.

10

Tr. 371.  He was trying to cut back on smoking marijuana but it was hard because he had smoked for many years.  Tr. 371.  Ms. Davis observed Robinson to have a constricted affect; pressured speech; circumstantial thought process; phobic thought content; normal cognition; average intelligence; partial insight; and mild impairment in ability to make reasonable decisions.  Tr. 372.  Robinson also saw Dr. Carson on December 13, 2016, and complained of depression and back pain.  Tr. 374.  Robinson relayed that his symptoms of depression occurred intermittently and his depression was aggravated by conflict or stress and social interactions.  Tr. 374.  Also, his depression was associated with his chronic low back pain.  Tr. 374.  On examination, Dr. Carson observed Robinson to have an appropriate mood and affect.  Tr. 377.  Dr. Carson's assessment was adjustment disorder with mixed disturbance of emotions and conduct and he recommended that Robinson continue with his then current prescriptions.  Tr. 377.

Robinson returned to Murtis Taylor on December 29, 2016.  Tr. 438-440.  Psychiatrist Irene Shulga, M.D., noted that Robinson's depression persisted notwithstanding an optimal dose of Prozac.  Tr. 438.  There was concern that the combination of Prozac and tramadol could increase Robinson's risk for serotonin syndrome.  Tr. 438.  Dr. Shulga prescribed prazocin and recommended that Robinson taper off Prozac.  Tr. 438.

During a January 10, 2017, session with Ms. Davis, Robinson's mood was pleasant and cooperative but more subdued.  Tr. 379.  Robinson discussed the possibility of moving to a warmer climate and relayed that his best friend and a cousin had died at the end of December.  Tr. 379.  On January 23, 2017, Robinson returned to see Dr. Shulga.  Tr. 430-432. Dr. Shulga noted that there had been improvement, noting that Robinson's nightmares had subsided and his irritability and depression were diminished.  Tr. 430.  Dr. Shulga discussed again the possible effect of combining Prozac with other medications.  Tr. 430.  Understanding those concerns,

11

Robinson wanted to continue taking Prozac.  Tr. 430.  He was also taking prazosin for his nightmares.  Tr. 430.

Robinson saw Ms. Davis on February 14, 2017.  Tr. 389-391.  Robinson relayed that with his new medication his nightmares had decreased.  Tr. 389.  However, he felt the medication was making him "sluggish" throughout the day.  Tr. 389.  He was taking a nap during the day but was finding "his mental processes slower than before."  Tr. 389.  Robinson had been communicating more with his daughter and granddaughter over the phone.  Tr. 389.  Ms. Davis encouraged Robinson to discuss his medication side effects with his prescriber.  Tr. 391.

When Robinson saw Ms. Davis on March 14, 2017, (Tr. 393-399), he reported feeling "hostile, combative, frustrated and annoyed[]" (Tr. 393).  Robinson relayed he was upset about one of the tenants in his mother's house calling the police to retrieve a box-spring that he had been storing in his room – he was upset that the tenant did not talk with him prior to calling the police about the issue.  Tr. 393.  Robinson relayed that his social security disability claim had been denied.  Tr. 394.  He was planning to speak with his lawyer regarding the next steps.  Tr. 394.  Robinson's mother had a birthday and they had a small celebration for her at her house.  Tr. 394.

Robinson saw Dr. Shulga on March 27, 2017, for medication management.  Tr. 416-419.  Robinson reported having withdrawal symptoms from stopping marijuana five weeks prior.  Tr. 416.  The prazosin was helping a little with his nightmares.  Tr. 416.  A friend of Robinson's had died the week prior from a heart attack.  Tr. 416.  Dr. Shulga noted that Robinson had a constricted affect but assessed Robinson's mental state as stable.  Tr. 416-417.  She continued his medications and recommended that he attend rehab treatment.  Tr. 417.

During a June 13, 2017, visit with Dr. Carson, Robinson complained of anxiety and back pain with associated muscle spasms.  Tr. 444.  On examination, Dr. Carson observed an appropriate mood and affect.  Tr. 446.  Dr. Carson noted that Robinson was taking Prozac for his depression.  Tr. 446.

When Robinson saw Dr. Shulga on August 7, 2017, Robinson reported having good and bad days but more good days.  Tr. 582.  Robinson had run out of prazosin for three weeks.  Tr. 582.  He was continuing to take Prozac that was prescribed by his primary care physician at NEON.  Tr. 582.  Robinson reported doing well with his "inner circle" of family.  Tr. 582.  There were good birthday parties the prior month; his daughters and grandchildren were doing well; and his brother from out of state was planning to visit.  Tr. 582.  Robinson discussed his continued difficulties with memories from being robbed years prior on Halloween.  Tr. 582.  Robinson's affect was appropriate.  Tr. 582.

Robinson saw Dr. Shulga on October 2, 2017.  Tr. 574-579.  Robinson complained of poor sleep, increased anxiety, and nightmares, noting that Halloween was approaching which was when he was assaulted years prior.  Tr. 576.  Robinson felt he was on the edge and irritable.  Tr. 576.  He denied any physical altercation.  Tr. 576.  Robinson reported living alone and having a supportive family.  Tr. 576.  He had not filled his prescription for prazosin.  Tr. 576.  He was continuing counseling every two weeks and indicated it "helped lot."  Tr. 576.  Dr. Shulga noted an exacerbation of PTSD, mainly nightmares and irritability.  Tr. 578.  Dr. Shulga recommended that Robinson restart prazosin because it had helped with nightmares.  Tr. 578.  She recommended an increase in the Prozac dose and that Robinson continue with counseling.  Tr. 578.

13

Robinson saw Dr. Shulga again on October 30, 2017.  Tr. 567-573.  Robinson was feeling nervous about the next day, i.e., Halloween.  Tr. 569.  His sleep had improved with prazosin.  Tr. 569.  Dr. Shulga noted an exacerbation of Robinson's PTSD symptoms relating to the upcoming anniversary of being attacked but felt that Robinson was able to deal with his symptoms.  Tr. 571.

On November 27, 2017, Robinson saw Dr. Shulga.  Tr. 560-566.  Robinson reported that he had been doing fairly well since the last visit.  Tr. 563.  His anxiety had diminished.  Tr. 563. He had occasional nightmares.  Tr. 563.  His sleep was interrupted by neck and shoulder pain. Tr. 563.  Robinson reported being upset on Thanksgiving when one of his mother's tenants had carved half of the turkey he had cooked for the family.  Tr. 563.  He denied any physical outburst.  Tr. 563.  Dr. Shulga noted that Robinson was calm and well engaged.  Tr. 564.  Dr. Shulga recommended that Robinson continue with Prozac and prazosin.  Tr. 564.

When Robinson saw Dr. Shulga on January 22, 2018, Robinson reported a mild increase in his depression and irritability.  Tr. 551.  He had a "few good days" when he was sleeping better.  Tr. 551.  On "bad days," Robinson was waking up every two hours.  Tr. 551.  His PTSD symptoms were relatively under fair control with no nightmares, intrusive thoughts, or anger.  Tr. 551.  Robinson was trying to abstain from marijuana use.  Tr. 551.  Due to the mild increase in depression, Dr. Shulga increased Robinson's Prozac.  Tr. 558.

During a February 13, 2018, counseling session with Ms. Davis, (Tr. 479-485), Robinson described his mood as "calm, annoyed, defensive, exhausted and overwhelmed[]" (Tr. 479).  He explained that fighting between some of the tenants was affecting his mood because their fighting was constant.  Tr. 479.  Robinson indicated that his psychiatrist had increased his Prozac

14

but he did not notice a difference yet.  Tr. 479.  Ms. Davis observed that Robinson's mood was pleasant and cooperative overall but he had some situational anxiety.  Tr. 479.

During his March 6, 2018, session with Ms. Davis, (Tr. 493-499), Robinson reported depressive symptoms relating to the loss of four relatives since his last session (Tr. 493).  He was having less "anger and irritability secondary to having limited verbal interactions with the tenants in the house."  Tr. 493.  Robinson indicated he was focusing on himself which was helping.  Tr. 493.  Ms. Davis noted that Robinson's mood was upbeat and pleasant; his affect was mood congruent.  Tr. 493.  Robinson saw Dr. Shulga about a week later and reported he was doing "so-so," noting he had four funerals over the prior month.  Tr. 540.  Robinson was very emotional but denied depression.  Tr. 540.  He reported his dreams had lessened; his sleep was improved; he had intermittent mood swings; he had fair control of his anger; and he had good support from his family, case manager, and therapist.  Tr. 540.  Dr. Shulga noted that Robinson's mood was "so-so" and he had a constructed affect.  Tr. 546.  She felt that Robinson had a reasonable emotional response to the deaths in his family.  Tr. 547.

During a visit with Dr. Shulga on April 8, 2018, Robinson reported two additional deaths in his family.  Tr. 638.  He was continuing to mourn the losses.  Tr. 638.  Robinson had occasional misperceptions during the day of "dead people talking."  Tr. 638.  He reported having good support from his family.  Tr. 638.  Robinson's tramadol had been discontinued, causing him to constantly be in pain and it was affecting his sleep.  Tr. 638.  Robinson's PTSD symptoms were "rather controlled" with only occasional, infrequent nightmares.  Tr. 638.

When Robinson saw Ms. Davis for a counseling session on April 10, 2018, he reported that his mood had been stable since his last visit.  Tr. 610.  He relayed that he recognized triggers to his anger and was using coping skills to diffuse situations.  Tr. 610.  He recognized that at

15

times his anger was disproportionate to the situation, which he attributed to an accumulation of stress and frustration.  Tr. 610.  Robinson indicated that, once the weather improved, he planned to increase outdoor social and recreational activities.  Tr. 610.  Ms. Davis observed Robinson's mood was thoughtful; his affect was constricted; and his thought process was circumstantial.  Tr. 612.

Robinson saw Ms. Davis again on May 15, 2018.  Tr. 621-627.  Robinson had been without pain medication for a month and it had been very difficult for him.  Tr. 621.  He was having "increased irritability and mood dysregulation secondary to having no pain medication for over a month."  Tr. 621.  He reported increased isolation to avoid negative interactions with his mother and her tenants.  Tr. 621.  Robinson described his then current mood as "annoyed, aggressive, irritated."  Tr. 621.  Ms. Davis discussed the "mind-body-emotion" linkage as related to pain; she processed Robinson's emotions of increased irritability and physical discomfort; she reviewed coping mechanisms and tools for relaxation; and she encouraged Robinson to continue walking his dog for exercise and stress relief.  Tr. 622.

### 2.  Opinion evidence

#### *Treating sources*

##### *Dr. Williams*

On November 2, 2016, Dr. Williams completed a "Medical Source Statement: Patient's Physical Capacity" form.  Tr. 333-334.  Dr. Williams opined that: Robinson's low back pain limited him to lifting 25 pounds occasionally and 15 pounds frequently; his neck and back pain limited his ability to stand/walk for a total of 2-3 hours and for 1 hour without interruption; he could rarely climb, balance, stoop, crouch, kneel, and crawl; he could occasionally perform gross manipulation; and he could frequently reach, push/pull, and perform fine manipulation; and

16

exposure to heights, moving machinery, temperature extremes, and pulmonary irritants would affect his impairment.  Tr. 333-334.  Dr. Williams noted no sitting limitations, but he opined that Robinson would require the ability to alternate positions between sitting, standing and walking at will.  Tr. 334.  Dr. Williams indicated that no assistive devices had been prescribed.  Tr. 334.  Dr. Williams rated Robinson's pain level as "moderate" with the other available ratings being "mild" and "severe."  Tr. 334.  Dr. Williams opined that Robinson's pain would cause Robinson to be off task and it would cause absenteeism.  Tr. 334.  Dr. Williams opined that Robinson would need additional unscheduled rest periods for an average of 2 hours per day.  Tr. 334.  Dr. Williams indicated that Robinson's PTSD would interfere with his ability to work 8 hours a day, 5 days a week.  Tr. 334.

### *Amber Dumas, LISW*

On April 10, 2018, Amber Dumas, LISW, completed a "Medical Source Statement – Mental Capacity" form, wherein she indicated she had been seeing Robinson since 2015.  Tr. 608-609.  In the form, Ms. Dumas was asked to rate Robinson's functional abilities in the areas of "understand, remember, or apply information"; "interact with others"; "concentrate, persist or maintain pace"; and "adapt or manage oneself."  Tr. 608-609.  There were eight categories to be rated within each of the four areas with rating choices of "no limitation (or none))," "mild limitation," "moderate limitation," "marked limitation," or "extreme limitation."  Tr. 608-609.

Ms. Dumas found only mild or moderate limitation in the area of "understand, remember, or apply information."  Tr. 608.

In the area of "interact with others," Ms. Dumas found no limitation in ability to ask for help when needed; mild limitation in ability to state own point of view; moderate limitation in ability to initiate or sustain conversation or understand and respond to social cues; marked

17

limitation in ability to cooperate with others, respond to requests, suggestions, criticism, correction and challenges, and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and an extreme limitation in ability to handle conflicts with others.  Tr. 608.

In the area of "concentrate, persist or maintain pace," Ms. Dumas found mild limitation in ability to initiate and perform a task that he understands and knows how to do and ignore or avoid distractions while working; moderate limitation in ability to change activities or work settings without being disruptive and work close to or with others without interruptions or distracting them; marked limitation in ability to complete tasks in a timely manner and sustain an ordinary routine and regular attendance at work; and extreme limitation in ability to work at an appropriate and consistent pace and work a full day without needing more than the allotted number or length of rest periods during the day.  Tr. 609.

In the area of "adapt or manage oneself," Ms. Dumas found no limitation in ability to maintain personal hygiene and attire appropriate to a work setting; mild limitation in ability to be aware of normal hazards and take appropriate precautions; moderate limitation in ability to distinguish between acceptable and unacceptable work performance; marked limitation in ability to adapt to changes, manage one's psychologically based symptoms, set realistic goals, and make plans for oneself independent of others; and extreme limitation in ability to respond to demands. Tr. 609.

When asked to state the diagnosis and medical and clinical findings that supported her assessment, Ms. Dumas stated "PTSD, chronic, major depressive disorder, recurrent, moderate. Recurring dreams related to past traumas.  Hypervigilance around anniversary dates.  Isolating behaviors and depressed mood/affect."  Tr. 609.

18

### *Consultative examiner*

#### *Dr. Sioson*

On February 23, 2017, Robinson saw Dr. Eulogio Sioson, M.D., for a consultative
evaluation.  Tr. 384-388.  Robinson reported having neck and back pain for five to six years.  Tr.
384.  Robinson could do laundry, clean, cook, do dishes and grocery shop but he indicated it
took him longer to perform the tasks.  Tr. 384.  He could mow the lawn but he could not shovel
snow.  Tr. 384.  He could dress himself and take care of his personal hygiene.  Tr. 384.  He could
lift and carry 10-15 pounds.  Tr. 384. Robinson has non-radicular back and neck pain after
walking 2-3 blocks, going up and down 17 steps, and standing and sitting for 15-20 minutes.  Tr
384.  Robinson rated his pain level as 8/10 with medications bringing his pain level down to
6/10.  Tr. 384.  Robinson had been referred to pain management but he had not yet scheduled a
visit.  Tr. 384.  There had been a request for a spinal injection but Robinson's insurance did not
approve the request.  Tr. 384.

Robinson also reported a six-year history of depression and PTSD, explaining he had
been at his uncle's store when it was robbed by robbers wearing Halloween masks.  Tr. 384.
Robinson relayed that he continued to have nightmares.  Tr. 384.  Robinson had not been
hospitalized as a result; he had suicidal thoughts with no attempt in the past.  Tr. 384.  Robinson
had poor sleep; his appetite was fair; his weight fluctuated; he felt tired and hopeless sometimes;
he had memory and concentration problems; and he did not hear voices but saw shadows and
figures wearing Halloween masks.  Tr. 384.  Robinson indicated that his medication helped
some.  Tr. 384.

On physical examination, Dr. Sioson observed that Robinson walked normally without an
assistive device; he could heel/toe walk; he rose from a half squat with back pain; he could get

19

up and down the examination table; there was no edema in the extremities; there was no tenderness, swelling, subluxation or gross deformity in the joints; he had moderate neck and low back tenderness; straight leg raising sitting was negative, lying 50 degrees bilaterally with hamstring pains; he was alert, coherent, and oriented; he was cooperative with no abnormal behavior or appearance; he had no rigidity or tremors; he had no sensory deficit; he had no muscle atrophy; manual muscle testing was normal; and he had no cerebellar signs.  Tr. 384-385.

Dr. Sioson's impression was neck/back pain – no apparent radiculopathy, gross deformity or inflammatory changes in the joints; and mental disorder – not emotionally labile and able to maintain concentration.  Tr. 385.  In summary, Dr. Sioson indicated that "there were no objective findings that would significantly affect walking, standing, sitting, lifting, carrying, handling but if one considers his pain and above findings, work-related activities could be limited to light work."  Tr. 385.

### *State agency medical consultants*

#### *Initial consideration level*

On February 6, 2017, state agency medical consultant Patricia Kirwin, Ph.D., reviewed the medical evidence and found that there was not new and material evidence since the prior April 2016 mental RFC determination.  Tr. 130-131.  Therefore, Dr. Kirwin adopted the prior RFC determination under AR 98-4 (Drummond Ruling), finding that Robinson had the mental RFC to perform simple, routine tasks and make simple work-related decisions; he could tolerate frequent interaction with supervisors, as well as occasional with coworkers and members of the general public; and he could relate with others on a superficial basis.  Tr. 130-131.

On March 3, 2017, state agency medical consultant Diane Manos, M.D., reviewed the medical evidence and found that it did not support a material change since the prior April 2016

20

RFC determination.  Tr. 130.  Therefore, Dr. Manos adopted the prior RFC under AR 98-4 (Drummond Ruling), finding that Robinson could perform medium work; he could frequently climb ramps/stairs, balance, stoop, crawl, kneel; crouch; he could not climb ladders, ropes, scaffolds; he must avoid hazards such as unprotected heights and moving mechanical machinery; and he could not perform commercial driving.  Tr. 130.  In reaching her conclusions, Dr. Manos considered the opinions of Dr. Williams and Dr. Sioson.  Tr. 129.  Dr. Williams' opinion was given other weight because they were found to be inconsistent with the totality of the evidence.  Tr. 129.  "For example, [Dr. Williams] opined that the [claimant] can rarely balance, but the [claimant] walks without an assistive device."  Tr. 129.  Dr. Sioson's opinion was also given other weight because, although his opinions were partially consistent with the findings, the opinions were internally inconsistent.  Tr. 129.  "For example, [Dr. Sioson] opined that there were no objective findings that would significantly affect walking, standing, lifting, carrying, and handling; then he went on to say work-related activities could be limited to light work."  Tr. 129.  Dr. Manos also considered Robinson's subjective statements regarding his symptoms and found that the degree to which Robinson alleged his symptoms of pain affected him was inconsistent with the medical evidence.  Tr. 129.  "For example, [Robinson] reports he can only lift 15 lbs, the medical evidence shows he has full strength in knees, hips, and back.  [Robinson's] statements regarding his conditions and the limitations they cause are found to be partially consistent."  Tr. 129.

*Reconsideration level*

Upon reconsideration, on April 21, 2017, state agency medical consultant, Kathleen Malloy, Ph.D., affirmed the findings of Dr. Kirwin.  Tr. 146.

21

Upon reconsideration, on April 25, 2017, state agency medical consultant, Dr. William Bolz, M.D., affirmed Dr. Manos's findings.  Tr. 145-146.

## C.      Hearing testimony

### 1.      Plaintiff's testimony

Robinson and was represented at the hearing.  Tr.  68-84.  Robinson was living with his mother who was 88-years old.  Tr. 69.  Robinson does not have a driver's license; he uses public transportation.  Tr. 69. Robinson's mother drives.  Tr. 78.

The ALJ asked Robinson what was different now as compared to the last time he had a hearing.  Tr. 71.  Robinson stated, "The pain and my mental status has gotten a little bit worser and I'm trying to keep it going right by keeping all of my appointments and my doctor visits."  Tr. 71.

Robinson explained that, for his depression, he was seeing his counselor Ms. Dumas once every month and a doctor every other month.  Tr. 71.  Robinson indicated that he was not receiving mental health treatment when he had the prior hearing – he stated that he started treatment about two or two and one-half years earlier.  Tr. 71-72.

Robinson was seeing a pain management doctor who had recently administered a shot in Robinson's lower back and he was scheduled to receive another shot in about a week.  Tr. 72. Robinson had some relief from his pain following the shot and was hoping for more relief with the next scheduled shot.  Tr. 82.  Robinson's doctor discussed the possibility of shots in other locations, e.g., the shoulder and neck.  Tr. 83.  Robinson had tried physical therapy for his back during the period between October 2017 and April 2018.  Tr. 72-73.  Robinson relayed that physical therapy eased the tension and stress that he had for short periods of time.  Tr. 77-78.  He stated he stopped attending physical therapy because "I had been on tramadol for, I think, four

years or better, and [my doctor] said I need to get off of that.  So, I said I'll try the injections to

see how that will work."  Tr. 78.  Robinson also had physical therapy "back on [his] old claim[.]"

Tr. 73.

       In addition to taking tramadol, Robinson was taking cyclobenzaprine for muscle spasms

and naproxen.  Tr. 78-79.  He was also taking Prozac and prazosin to help with his nightmares

and PTSD symptoms.  Tr. 79.  Robinson explained that he has a nightmare where he wakes up

and sees a Halloween mask and a gun shooting at him.  Tr. 79.  Before starting the medication,

he was having nightmares almost every night.  Tr. 80.  With the medication, he has them about

twice every month.  Tr. 80.  The Prozac is prescribed to help Robinson with his depression and

to help him ease back into being around other people.  Tr. 80.  Usually, Robinson spends most of

his time in his room or in the backyard.  Tr. 80.  When Robinson is in his room, he listens to

music or watches television.  Tr. 81.  Robinson isolates himself because he gets nervous and

anxious and feels like he is being closed in on when around others.  Tr. 81.  He has neighbors but

does not really socialize with them.  Tr. 81.  Robinson indicated he has had an argument or two

with neighbors but nothing physical.  Tr. 81.  He relayed that he had not recently argued with

anyone, noting he tries to keep to himself to avoid being argumentative or feeling threatened.  Tr.

81.

       On a typical day, Robinson helps take care of his mother by putting her shoes on for her

because she cannot bend down.  Tr. 73, 83.  Robinson also does the cooking and the laundry.  Tr.

73, 80, 83.  About once every week, Robinson walks to a store to pick up eggs, milk, bread, meat

for dinner, and side dishes.  Tr. 73-74.  The store is about a five-minute walk from Robinson's

house.  Tr. 74.  Robinson explained that he can only carry about three to five pounds in each

hand for a short period of time.  Tr. 73-74.  His mother takes care of getting other household

items like dish detergent, soap, etc.  Tr. 74.  The washer and dryer are in the basement.  Tr. 74.

Robinson does the laundry about one each week.  Tr. 74.  Robinson's mother has an aide that

comes to the house to perform house cleaning and assist his mother with bathing.  Tr. 75.

Robinson's cousin has been taking care of the yardwork at the house for about three or four

years.  Tr. 75.

Robinson estimated being able to walk for 10 minutes before needing to stop and take a

break.  Tr. 81.  He has to stop because of pain in his lower back and neck.  Tr. 82.  If Robinson

lifts more than five pounds at a time, he feels a sharp pain in the lower part of his back.  Tr. 82.

As far as hobbies, Robinson used to enjoy playing basketball and chess but he no longer

plays basketball and does not really play chess any longer because he does not have the patience

for it.  Tr. 75.  Robinson has one daughter (age 36) and a granddaughter (age 3).  Tr. 76.

Robinson does not see his daughter often because she lives in New York but, they stay in touch

via phone about once or twice each week.  Tr. 76.

The ALJ asked Robinson about a January 2018 medical office visit note that indicated

that Robinson had sustained an injury when stepping on a nail that was a on a board when he was

fixing a leaking tub in a rental apartment.  Tr. 76.  Robinson stated he never told the doctor that

he was working on a tub; he told the doctor he had stepped on a nail.  Tr. 77.  Robinson

explained that the nail he stepped on was in his backyard.  Tr. 77.

### 2.    Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 84-87.  The ALJ indicated that

the only past work he was considering was Robinson's past work as a nurse assistant, an SVP 4[6]

---

[6] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).  "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Id.

position, typically performed at the medium exertional level but performed by Robinson at the heavy to very heavy exertional level.  Tr. 71, 85.

The ALJ asked the VE to assume an individual of Robinson's age and education and past work as described who is limited to medium exertional work; can frequently climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently balance, stoop, kneel, crouch, and crawl; can never work at unprotected heights or near moving mechanical parts; cannot engage in commercial driving; limited to simple, routine tasks and can make simple work-related decisions; can tolerate frequent interactions with supervisors and only occasional interaction with coworkers and the public; and can relate to others on a superficial basis, meaning no arbitration, negotiation or confrontation.  Tr. 85.   The VE indicated that the described individual could not perform Robinson's past work but the described individual could perform other jobs in the national economy, including hand packager, hospital cleaner, and store laborer.  Tr. 85-86.

The ALJ then asked the VE whether the individual described in the first hypothetical would be able to perform Robinson's past work if the exertional level was reduced to the light level.  Tr. 86.  The VE responded that the individual would not be able to perform Robinson's past work.  Tr. 86.

Robinson's counsel asked the VE what physical exertion jobs could be identified for an individual who can lift and carry 25 pounds occasionally and 15 pounds frequently but who can stand and walk no more than three hours out of an eight-hour day and who can only occasionally perform gross manipulation.  Tr. 87.  The VE indicated that the jobs would be sedentary.  Tr. 87.  Robinson's counsel also asked the VE what the typical allowance would be for off-task behavior for the unskilled jobs identified in response to the ALJ's first hypothetical.  Tr. 87.  The VE indicated that being off task 15% of the time or more would be work preclusive.  Tr. 87.

25

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

26

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S.

Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

### IV. The ALJ's Decision

In his August 14, 2018, decision, the ALJ made the following findings:[7]

1.  Robinson meets the insured status requirements of the Social Security Act through March 31, 2015.  Tr. 37.

2.  Robinson has not engaged in substantial gainful activity since December 8, 2016, the alleged onset date.  Tr. 37.

3.  Robinson has the following severe impairments: degenerative disc disease of the spine, osteoarthritis and allied disorders; post-traumatic stress disorder ("PTSD"); and substance addiction. Tr. 37.  Robinson has non-severe impairments of mild visual impairment, eczema, anxiety, depression, and adjustment disorder.  Tr. 37.

4.  Robinson does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 38-43.

5.  Robinson has the RFC to perform a range of medium exertional work as defined in 20 C.F.R. § 416.967(c), subject to the following: he can lift and/or carry 50 pounds occasionally and 25 pounds frequently; he can sit, stand, or walk for 6 hours each per 8-hour workday; he can frequently climb ramps and stairs, and frequently balance, stoop, kneel, crouch, and crawl; he cannot climb ladders, ropes, or scaffolds; he must avoid hazards such as unprotected heights and moving mechanical machinery; he cannot perform commercial driving; he can perform simple, routine tasks and make simple work-related decisions; he can tolerate frequent interaction with supervisors and occasional interactions with coworkers and members of the general public; he can relate with others on a superficial basis (with

---

[7] The ALJ's findings are summarized.

"superficial" meaning no arbitration, negotiation, or confrontation).  Tr. 43-54.

6.      Robinson is unable to perform any past relevant work.  Tr. 54.

7.      Robinson was born in 1957 and was 59 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date.  Tr. 55.  Robinson subsequently changed age category to advanced age.  Tr. 55.

8.      Robinson has at least a high school education and is able to communicate in English.  Tr. 55.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 55.

10.     Considering Robinson's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Robinson can perform, including hand packager, hospital cleaner, and store laborer.  Tr. 55-56.

Based on the foregoing, the ALJ determined that Robinson had not been under a disability, as defined in the Social Security Act, from December 8, 2016, through the date of the decision.  Tr. 56.

## V. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The undersigned recommends that the Court find that the ALJ did not err in his application of *Drummond* or in his review and consideration of the evidence when formulating Robinson's RFC.**

Robinson argues that the evidence shows that his PTSD and spinal disorders significantly worsened since the prior 2016 ALJ decision.  Doc. 14, pp. 13-17.  Therefore, he contends that it was error for the ALJ in his 2018 decision to apply *Drummond* and reach the same RFC findings as found by the prior ALJ in the 2016 decision.  Doc. 14, pp. 13-17.

In *Drummond*, the Sixth Circuit held that, "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d at 842.  The Social Security Administration, in AR 98-4(6), explained how the Social Security Administration would apply *Drummond* to decisions within the Sixth Circuit.  AR 98-4(6), *Effect of Prior Findings on Adjudication of a Subsequent Disability Claim Arising Under the Same Title of the Social Security Act -- Titles II and XVI of the Social Security Act*, 1998 WL 283902 (June 1, 1998).   As stated in AR 98-4(6):

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

*Id.* at 3.

More recently, in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (2018), the Sixth Circuit examined *Drummond* and the principles of res judicata, when reversing a district court's decision which had reversed a denial of benefits on the basis that the "'principles of res judicata' announced in *Drummond* appl[ied] only when they favor an individual applicant, not the government, in a subsequent proceeding." *Id*. at 930.  The Sixth Circuit concluded that the district court was incorrect because "[t]he key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications—apply to individuals *and* the government." *Id.* at 931.  Also, the court found that, "At the same time, [those principles] do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.*  The court further explained that, "Fresh review is not blind review.  A later administrative judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

Thus, when a claimant has previously filed an application for benefits and an ALJ rendered a decision, an ALJ considering a claimant's new application encompassing a different time period may find that the prior ALJ's findings are legitimate and adopt those findings absent new and material evidence.  *Earley*, 893 F.3d at 933; *Drummond*, 126 F.3d at 842.

Robinson does not contend that the ALJ did not consider evidence submitted in connection with his new application.  Rather, he argues that the ALJ erred by not finding that his PTSD and spinal disorders significantly worsened such that that ALJ should have found greater RFC limitations than those contained in the prior ALJ's decision.  Doc. 14, p. 13.

To support his claim that his physical impairments worsened since the prior decision, Robinson points to cervical and lumbar spine diagnostic testing from August 1, 2016 (Tr. 335-336); examination findings showing moderate neck and low back tenderness, reduced range of motion of the cervical spine, shoulders and lumbar spine, and positive straight leg raising, pinpoint tenderness at C5, T6, L5, positive spurlings, and pain from rising from squatting (Tr. 385, 387-388, 633-639); and the opinions of Dr. Williams and Dr. Sioson (Tr. 333-334, 385). Doc. 14, p. 15.  Robinson also points to evidence that was not submitted to the ALJ.  *Id.* (citing Tr. 9-11, 14, 19).

To support his claim that his mental health impairments worsened since the prior decision, Robinson contends that he did not begin mental health treatment until after his prior hearing, arguing that the evidentiary records indicate that he did not begin mental health treatment until July 2016.  Doc. 14, pp. 15-16 (citing Tr. 71-72 (Hearing Testimony) and Tr. 337 (7/12/2016, NEON counseling notes)).  He also points to various mental health treatment notes showing a recurrence of nightmares, disrupted sleep, increased irritability, self-isolation, difficulty concentrating, and constricted/flat affect; and the opinion of Ms. Dumas, his psychotherapist.  Doc. 14, p. 16 (citing Tr. 337-338, 353, 356,401, 405, 408-409, 416, 438, 608-609).

Robinson's reliance on medical records submitted to the Appeals Council but not to the ALJ to show that the ALJ erred in considering his claim and assessing his RFC is futile.

Whether or not Robinson is entitled to a sentence six remand for consideration of this later submitted evidence is discussed below.

Robinson's claim that he did not start receiving mental health treatment until after the prior hearing, which was held on February 9, 2016 (Tr. 93), is not supported by the medical record evidence.  He argues that his mental health treatment did not start until July 2016, citing a July 12, 2016, NEON counseling record from a session with his psychotherapist Ms. Dumas.  That psychotherapy record, however, does not indicate that it was his first mental health treatment session.  Rather, the record states that Robinson was being seen for "f/u appt."  Tr. 337.  Also, a July 2016 medical record from Murtis Taylor reflects that Robinson reported receiving mental health treatment at MetroHealth in 2010 to 2012 and at NEON since 2015.  Tr. 408; *see also* Tr. 609 (Ms. Dumas opinion, noting that Robinson had been under NEON's care since 2015).  And, the prior ALJ, who rendered his decision on April 29, 2016, (Tr. 106), discussed Robinson's mental health treatment and evaluations that occurred during 2014 and 2015 (Tr. 101-102).  Thus, Robinson's claim that his mental health symptoms were new or had worsened because he was not even being treated for his mental health impairments before his prior hearing is unsupported by the record.

Regarding the other evidence that Robinson points to in an attempt to show that the ALJ erred in not finding a more restrictive RFC, Robinson has not argued or shown that the ALJ did not consider the evidence.  In essence, Robinson disagrees with the ALJ's finding that his symptoms were not as disabling as he alleged.  However, the ALJ conducted a thorough review of the evidence Robinson presented in support of his new application for SSI, including treatment records and opinion evidence.[8]  Tr. 37-54.  Consistent with *Earley*, the ALJ did not

---

[8] The ALJ considered and weighed the opinions rendered by Dr. Williams, Dr. Sioson, and Ms. Dumas.  Tr. 51-53.  Robinson does not raise a specific challenge regarding the ALJ's weighing of the opinions rendered by Dr. Sioson or

simply accept the prior RFC without conducting a fresh review of the evidence.  Having

conducted a fresh review, the ALJ explained that he found that Robinson had not submitted

evidence sufficient to support a change to the prior ALJ's RFC finding.  Tr. 34-35. While

Robinson contends that there is substantial evidence to support his claim that his symptoms are

disabling, the ALJ having considered the entirety of the record, found otherwise.  And, even if

substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence

also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  Furthermore, it is not

for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of

credibility."  *Garner,* 745 F.2d at 387.  The ALJ's decision makes clear that the ALJ fully

considered the record when formulating Robinson's RFC.

　　　　For the foregoing reasons, the undersigned recommends that the Court find that the ALJ

did not err in his application of *Drummond* or in his review and consideration of the evidence

when formulating Robinson's RFC.

### C.　　The undersigned recommends that the Court find that the ALJ did not err in weighing Dr. Williams's opinion.

　　　　Robinson argues that the ALJ erred in assigning less than controlling weight to the

opinion of his treating physician Dr. Williams.  Doc. 14, pp. 17-21.

　　　　Under the treating physician rule, "[t]reating source opinions must be given 'controlling

weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable

clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d

---

Ms. Dumas.  While Robinson challenges the weight assigned to Dr. Williams's opinion, as discussed below,
Robinson has not demonstrated that the ALJ erred with respect to that opinion.

365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). The "procedural 'good reasons' rule serves both to ensure the adequacy of review and to permit the claimant to understand the disposition of [her] case." *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29, 2018)(quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)), *report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

The ALJ did not ignore Dr. Williams's opinion. The ALJ considered the opinion, stating:

> The undersigned gives little weight to the opinion of treating physician, Jerome Williams M.D., dated November 2, 2016. (B1F). The doctor opined that the claimant is limited to lifting 25 pounds occasionally and 15 pounds frequently; he is able to stand or walk a total of 2-3 hours per day total and I hour without interruption; he has no limitations on sitting; he can rarely climb and perform postural activities; he can only frequently reach, push/pull, and perform fine manipulation; he can only occasionally perform gross manipulation; he should avoid hazards, temperatures extremes, and pulmonary irritants; he experiences

34

"moderate" pain, which does not interfere with his concentration; he would be off-task and absent 2 days per week because of pain.  (B1F/1-2).  The criteria for evaluating medical opinions are set forth in 20 CFR 416.927. These sections state, among other things, that generally more weight is given to the opinions of treating sources because they are likely to be most able to provide a detailed, longitudinal picture of the claimant's impairments.  However, if it is found that a treating source's medical opinion on the issue of the nature and severity of the claimant's impairments is not well supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other evidence of record, it will not be given controlling weight.  The undersigned gives little weight to this opinion for the following reasons.  The record does not support that the doctor treated the claimant consistently.  The doctor's own examination findings do not support the existence of any physical functional limitations. For example, at exam on September 12, 2016, Dr. Williams noted normal findings throughout, including normal extremities, sensation, and deep tendon reflexes.  (B2F/17).  These examination findings do not support any degree of physical limitation, and they certainly do not support any limitations on standing, walking, lifting, carrying, or use of the upper extremities.   Moreover, the doctor's opinion is inconsistent with the other evidence of record, including examination findings and other medical opinions.  The claimant's examination findings consistently sh[owed] full strength, sensation, and reflexes in the bilateral upper and lower extremities, and an unassisted, normal gait. (See e.g., examination findings at B2F/34-35; B3F/l-5; B8F; 24; B11F/21; and B15F/6-7).  Also, imaging showed minimal degenerative changes with DISH.  (B2F/l and B2F/2).  The state agency medical consultants reviewed Dr. Williams' opinion, and based on the more complete record available to them, including the imaging and most of the examination findings noted above, they conclude that the claimant was capable of less than a full range of medium exertion.  (See B4A/11; B6A/10-11; and B7A/10-11).  Their opinions are well supported and consistent with the evidence of record generally.   Based on its lack of support and consistency with the record generally, the undersigned gives little weight to Dr. Williams' opinion.

Tr. 51-52.

Robinson contends the foregoing detailed explanation of the weight assigned to Dr. Williams' opinion does not satisfy the treating physician rule and is unsupported by the evidentiary record.

Robinson cannot and does not appear to dispute the ALJ's finding that Dr. Williams did not consistently treat Robinson.  Robinson acknowledges the minimal amount of treatment records from visits with Dr. Williams.  Doc. 14, p. 18 (stating "The evidentiary record contains

two patient notes of Dr. Williams in July and September 2016.") (citing Tr. 340, 350). In fact, contrary to Robinson's statement that there are two patient notes of Dr. Williams, only one of those records is Dr. Williams. The July 29, 2016, office visit notes indicate that the provider was Suzanne White, M.D. Tr. 340-343. In any event, whether Dr. Williams saw Robinson once or twice, the ALJ appropriately considered the lack of consistent treatment when weighing Dr. Williams's opinion. Moreover, in light of the limited treatment relationship between Dr. Williams and Robinson, the ALJ was not even required to weigh Dr. Williams's opinion under the treating physician rule. *See e.g., Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 506-507 (6th Cir. 2006) (finding single examination not sufficient to establish an ongoing treatment relationship)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490-491 (6th Cir. 2005) (finding two visits not sufficient to implicate the treating physician rule). Even so, the ALJ did weigh Dr. Williams' opinion under the treating physician rule. And Robinson's attempt to demonstrate that the ALJ's reasons for assigning little weight to the opinion are unsupported by substantial evidence fails.

For example, as the ALJ explained, the ALJ discounted Dr. Williams's opinion because he found Dr. Williams's own examination findings did not support physical functional limitations. Tr. 52. In support, the ALJ cited Dr. Williams's September 12, 2016, treatment notes that included normal physical examination findings. Tr. 52 (citing B2F/17 (Tr. 351)). Robinson does not contend that the examination findings from the September 12, 2016, visit were not normal but points out that those same treatment notes show that Robinson rated his pain as 10/10 in the low back and neck and Dr. Williams prescribed tramadol, a pain medication. Doc. 14, pp. 18-19. Robinson also points to the August 1, 2016, cervical and lumbar spine x-rays findings to support his claim that the ALJ erred in not assigning controlling weight to Dr.

Williams' opinion.  Doc. 14, pp. 18-19.  However, the ALJ considered Dr. Williams' treatment

notes as well as the diagnostic findings but found Dr. Williams' more restrictive limitations not

supported by and/or not consistent with that evidence.  Tr. 45, 52.

Robinson also argues that there are other examinations findings that support Dr.

Williams' opinion.  Doc. 14, pp. 19-20.  Robinson's argument that the ALJ's reliance on various

office treatment notes was misplaced or that the ALJ did not properly construe treatment records

amounts to a request that the Court consider the evidence de novo.  Moreover, even if substantial

evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing

court cannot overturn the Commissioner's decision "so long as substantial evidence also supports

the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.

Robinson also argues that the ALJ's finding that Dr. Williams' opinion was not

consistent with other medical opinions was misplaced.  He contends that Dr. Sioson's opinion

actually undermines the ALJ's decision because Dr. Sioson concluded that, if Robinson's pain

was considered along with other findings, work-related abilities could be limited to light work.

Doc. 14, p. 20.  The ALJ considered Dr. Sioson's opinion and concluded that it was only entitled

to partial weight.  Tr. 51.  Robinson has not separately challenged the weight assigned to Dr.

Sioson's opinion.  Moreover, as reflected in Dr. Sioson's opinion, he stated that there were no

objective findings that would significantly affect walking, standing, sitting, lifting, carrying and

handling.  Tr. 385.  Dr. Sioson's opinion regarding the possible restriction to light work took into

account Robinson's reports of pain.  Tr. 385.  However, as discussed in his decision, the ALJ did

not find Robinson's subjective allegations of pain entirely consistent with the evidence of record.

Tr. 48-49.

37

Robinson also challenges the ALJ's reliance on the non-examining physicians' opinions and his finding that their opinions were more consistent with and supported by the record. Doc. 14, pp. 20-21. An ALJ is not prohibited from assigning more weight to a non-examining physician. *See e.g., Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("In appropriate circumstances, opinions from State agency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources.") (quoting Soc. Sec. Rul. 96–6p, 1996 WL 374180, at *3 (July 2, 1996)). In this case, the non-examining physicians considered the medical evidence, including the opinions of Drs. Williams and Sioson, finding them not consistent with other evidence or internally inconsistent. *See e.g.* Tr. 129, 145. Contrary to Robinson's position, he has not shown that the ALJ's reliance upon or weighing of the non-examining physicians' opinions was clear error.

Considering the foregoing, Robinson has not shown that the ALJ failed to satisfy the treating physician rule when considering and weighing Dr. Williams's opinion. Moreover, the ALJ sufficiently explained the reasons for assigning little weight to Dr. Williams' opinion and Robinson has not shown that those reasons are unsupported by substantial evidence. Accordingly, the undersigned recommends that the ALJ did not err in weighing Dr. Williams' opinion.

**D.      The undersigned recommends that the Court find that Robinson is not entitled to a sentence six remand.**

Robinson argues that the ALJ erred in not properly reviewing new and material evidence that he submitted to the Appeals Council and seeks a remand for consideration of the evidence presented to the Appeals Council. Doc. 14, pp. 21-23.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, the court's substantial

38

evidence review is limited to the evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96 F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  Furthermore, a court "is charged with reviewing the decision of the ALJ, and not the denial of review by the Appeals Council, because when the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner."  *Osburn*, 1999 WL 503528, at * 4 (citing *Casey*, 987 F.2d at 1233).

The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006). The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it can consider such evidence only in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

To the extent Robinson contends that the ALJ erred by not considering evidence submitted to the Appeals Council, his claim fails.  An ALJ cannot err by not considering evidence not presented to him.  And, as discussed above, the Court's substantial evidence review is limited to evidence before the ALJ.

Also, for the reasons explained below, Robinson's request for a remand pursuant to sentence six of 42 U.S.C. § 405(g) fails.  The plaintiff has the burden under sentence six of 42 U.S.C. §405(g) to demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was "good cause" for his failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").  Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted and emphasis supplied).  "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted and emphasis supplied).

The records submitted to the Appeals Council are from office visits with Dr. Hayek dated 5/17/2018 (Tr. 21-25); 7/5/2018 (Tr. 14-20); 10/25/2018 (Tr. 10-12); and 11/28/2018 (Tr. 9).

Assuming arguendo that Robinson could demonstrate that the May and July 2018 treatment notes, which pre-date the ALJ's August 14, 2018, decision constitute new and material evidence, he has made no attempt to demonstrate good cause for not presenting the evidence for inclusion at the hearing or before the ALJ rendered his decision.

Also, assuming arguendo that Robinson could demonstrate that the other records that are dated October and November 2018 and post-date the ALJ's decision are new and/or that he had

40

good cause for not obtaining the treatment reflected in those records prior to the hearing, Robinson has not shown how they are material to the period at issue before the ALJ, i.e., the alleged onset date of December 8, 2016, through the date of the ALJ's decision.  At best, the allegedly "new" and "material" evidence is evidence of a worsening condition.  However, a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).  If Robinson's condition seriously worsened after the administrative hearing, an appropriate remedy would be the initiation of a new claim for benefits as of the date that his condition rose to the level of a disabling impairment.  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Based on the foregoing, the undersigned recommends that the Court find that Robinson is not entitled to a sentence six remand for the purpose of considering additional evidence not submitted to the ALJ.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

August 4, 2020                              */s/ Kathleen B. Burke*
                                            Kathleen B. Burke
                                            United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the

right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).